Anthony J. COVEY; Caren F. Covey; Anthony Pegnatori; Karen Pegnatori, Robert J. Linn, Plaintiffs–Appellants,

v.

HOLLYDALE MOBILEHOME ESTATES; Hub City Construction, Inc., a California corporation; Elizabeth Scott; W.H. Stauder; The C. Paul Scott and Louise Mary Scott Trust dated November 2, 1970, individually and d/b/a Hub City Construction Co. and d/b/a Hollydale Mobilehome Estates; Paul J. Scott; Jean Ann Crilley; Defendants–Appellees.

No. 96–55056.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1997.

Decided June 18, 1997.

Kurt Delsack, Corona Del Mar, CA, and Paul E. Fisher, Fisher & Associates, Newport Beach, CA, for plaintiffs-appellants.

Robert S. Coldren, Hart, King & Coldren, Santa Ana, CA, for Hollydale Mobile, etc, et al., and Jim P. Mahacek, Callahan & Blaine, Irvine, CA, for Jean Ann Crilley.

* Honorable Leonard D. Wexler, Senior United States District Judge for the Eastern District of New York, sitting by designation.

Before: FLETCHER and PREGERSON, Circuit Judges, and WEXLER,* District Judge.

FLETCHER, Circuit Judge:

Anthony Covey, Caren Covey, Anthony Pegnatori, and Karen Pegnatori ("Appellants") lived in a mobile home park where children were unwelcome. They sued Hollydale Mobile Home Estates ("the Park") and its owners, trustees and employees (collectively, "Appellees"), claiming that Appellees discriminated against them on the basis of familial status, in violation of the Fair Housing Act ("FHA"), because they had children living in their mobilehomes. During the pendency of Appellants' action, the Department of Housing and Urban Development ("HUD") changed the regulations applicable to housing that could qualify as senior housing. After this appeal was filed, Congress amended the FHA to eliminate the challenged requirement for qualified senior housing. Because we conclude that neither the new regulations nor the statutory amendment apply to this case, we reverse the district court's summary judgment order and remand for trial.

## I. BACKGROUND

### A. FACTS

The Park is a 134–unit mobilehome park located in a rustic area of Brea, California. Until September 1988, the Park operated as an adult park and required all residents to be over eighteen years of age. When Congress amended the FHA to prohibit discrimination based on familial status, the Park elected to become a senior citizens' community. On September 1, 1988, the Park notified its residents that after March 1, 1989, they could sell their units only to persons aged fifty-five

or older; existing residents would be "grand-fathered in." The Park amended its rules and regulations to reflect its new status as a "senior citizens' community."[1]

Anthony Covey had moved into the Park in 1984. Caren (Floyd) Covey moved in with him in 1991. They later married, and on May 17, 1993, their daughter Kaitlyn was born and began living in the Coveys' mobile-home.

Anthony and Karen Pegnatori began residing in the Park on August 1, 1988. In March 1991, their adult daughter Holly temporarily moved back to the Pegnatoris' mobilehome; in August 1993, Holly became a permanent resident of the Pegnatoris' home. Holly has a minor daughter, Nina, who resides at least semi-permanently in the Pegnatoris' mobile-home.

In October 1994, the Park converted to an all-ages park. In December 1994, the Park was sold. As of approximately September 1995, neither the Coveys nor the Pegnatoris still resided in the Park.

## B. STATUTORY AND REGULATORY FRAMEWORK

The Fair Housing Act prohibits discrimi-nation on enumerated bases in the sale or rental of public or private housing. 42 U.S.C. § 3604 (1994). In 1988, Congress amended the FHA to prohibit housing dis-crimination based on "familial status," de-fined as one or more individuals (who have not attained the age of 18 years) being domi-ciled with—

(1) a parent or another person having legal custody of such individual or individu-als; or

(2) the designee of such parent or other person having such custody with the writ-ten permission of such parent or other person.

*Id.* § 3602(k).

However, Congress recognized that many senior citizens wish to live in senior-oriented communities and that the prohibition against familial status discrimination might reduce the availability of affordable senior housing. Congress therefore exempted "housing for older persons" from compliance with the FHA's familial status provisions. *Id.* § 3607(b)(1). The FHA includes three types of exempted "housing for older persons:" housing provided under a state or federal program to assist elderly persons; housing intended for and solely occupied by persons 62 years of age or older; and housing intend-ed and operated for occupancy by at least one person 55 years of age or older per unit. *Id.* § 3607(b)(2). This case involves "55 or older" housing.

Under the 1988 amendments, housing qualifies for the "55 or older" exemption if it demonstrates:

(i) the existence of significant facilities and services specifically designed to meet the physical or social needs of older per-sons, or if the provision of such facilities and services is not practicable, that such housing is necessary to provide important housing opportunities for older persons; and

(ii) that at least 80 percent of the units are occupied by at least one person 55 years of age or older per unit; and

(iii) the publication of, and adherence to, policies and procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older.

*Id.* § 3607(b)(2)(C) (West Supp.1995). Hous-ing facilities in which fewer than 80% of the units were occupied by at least one person 55 years of age or older on September 13, 1988, may qualify so long as new residents meet the age requirement. *Id.* § 3607(b)(3).

Congress charged the Department of Housing and Urban Development ("HUD") with implementing the FHA. *Id.* § 3614a. On January 23, 1989, HUD issued regula-tions implementing the 1988 amendments, including the "housing for older persons"

---

1. Effective April 1, 1989, the Park's regulations provided: Hollydale Mobilehome Estates is a senior citizens' community. At least one (1) oc-cupant of the Mobilehome must be fifty-five (55) years of age or older, and all other occupants must be at least eighteen (18) years of age or older.

exemption. 54 Fed.Reg. 3232, 3290 (Jan. 23, 1989).[2]

HUD's definition and interpretation of the "significant facilities and services" requirement proved difficult to implement. That requirement became the source of numerous administrative complaints, and housing providers had great difficulty proving compliance. *See* S.Rep. No. 172, 104th Cong., 1st Sess. 2, 1996 U.S.C.C.A.N. 778 (Nov. 9, 1995) (Report on Pub.L. No. 104–76); *id.* at 10 (Statement of Senator Kyl). In 1992, Congress ordered HUD to issue within 180 days a revised rule containing a workable definition of "significant facilities and services." Housing and Community Development Act of 1992, Pub.L. No. 102–550, 106 Stat. 3883 (Oct. 28, 1992) § 919. HUD's initial proposed rule, issued in July 1994, was widely criticized. *See* 59 Fed.Reg. 34902 (July 7, 1994). After reviewing thousands of comments and holding hearings across the country, HUD issued a substantially revised proposal, which it published as a final rule on August 18, 1995. 60 Fed.Reg. 43322 (Aug. 18, 1995).

The 1995 regulations expressly placed the burden of proving qualification on the housing provider claiming the exemption. *Id.* at 43327 (amending 24 C.F.R. § 100.304(b)).[3] They also required the housing provider to "affirmatively demonstrate[ ] through credible and objective evidence that facilities and services specifically designed to meet the needs of older persons are 'significant.' " *Id.* at 43328 (publishing 24 C.F.R. § 100.306(a)). The 1995 regulations defined "significant facilities and services specifically designed for older persons" as "those which actually or

predictably benefit the health, safety, social, educational, or leisure needs of older persons." *Id.*

The new regulations provided twelve categories listing numerous facilities and services. *Id.* at 43328–29 (publishing 24 C.F.R. § 100.306(d)). A housing provider could establish that it met the "significant facilities and services" criterion by making available, directly or indirectly, at least two facilities and services in at least five categories, including at least two facilities in either category 10 (leisure needs) or 11 (health/safety needs). *Id.* at 43328 (publishing 24 C.F.R. § 100.306(c)). The rule also listed criteria for HUD's evaluation of whether a provider's facilities and services, in the aggregate, were "significant." *Id.* at 43329 (publishing 24 C.F.R. § 100.306(f)). The new rule did not substantially change the "impracticability" test, the 80% requirement, or the intent requirement.[4]

The new regulations took effect on September 18, 1995. Three months later, Congress amended the FHA to eliminate the "significant facilities and services" requirement from the housing for older persons exemption. Pub.L. No. 104–76, 109 Stat. 787 (Dec. 28, 1995) (*codified at* 42 U.S.C. § 3607(b)(2)(C) (1996)). HUD subsequently revised its implementing regulations to reflect the amendment. *See* 24 C.F.R. § 100.304 (1996); 61 Fed.Reg. 18249 (Apr. 25, 1996).

## C. PROCEDURAL HISTORY

On December 1, 1993, the Coveys filed a complaint against Hollydale Mobile Home

---

**2.** Under the 1989 regulations,
"Significant facilities and services specifically designed to meet the physical or social needs of older persons" include, but are not limited to, social and recreational programs, continuing education, information and counseling, recreational, homemaker, outside maintenance and referral services, an accessible physical environment, emergency and preventive health care o[r] programs, congregate dining facilities, transportation to facilitate access to social services, and services designed to encourage and assist residents to use the services and facilities available to them (the housing facility need not have all of these features to qualify for the exemption . . .).

24 C.F.R. § 100.304(b)(1) (1995). The regulations also defined the alternative "impracticability" qualification, the 80% requirement, and the intent requirement. *Id.* § 100.304(b)(2)-(d).

**3.** Because Congress amended the FHA in December 1995, the 1995 regulations were never codified.

**4.** The new rule did clarify that "[t]he publication of policies and procedures describing an intent to provide housing as 'adult housing' shall not suffice" for purposes of qualifying for the exemption. 60 Fed.Reg. at 43328 (publishing 100.305(d)).

Estates, Hub City Construction Company, Elizabeth Scott, William Stauder, and ten unnamed defendants. The Coveys alleged that the defendants were discriminating against them based on familial status in violation of the FHA. The complaint included two federal law causes of action for discrimination and declaratory relief and five state law causes of action for various tort and contract claims. The Coveys sought compensatory and punitive damages in amounts to be proven at trial, injunctive relief, and declaratory relief.

On March 9, 1994, the district court granted the Coveys a preliminary injunction barring the defendants from evicting them or attempting to prevent their daughter from residing in the Park during the action's pendency.

In July 1994, the district court allowed the Coveys to join the Pegnatoris as plaintiffs. The Pegnatoris alleged that the Park had discriminated against them on the basis of familial status after their minor granddaughter began living with them. The district court also declined to exercise supplemental jurisdiction over the Coveys' state law claims pursuant to 28 U.S.C. § 1367.

The defendants moved for summary judgment. On November 30, 1994, the district court denied the defendants' motion, finding that genuine issues of material fact remained as to whether the Park satisfied either the significant facilities and services requirement or the alternative "impracticability" test, whether the Park met the 80% requirement, and whether the defendants' enforcement of the Park's age policy was reasonable.[5]

On May 12, 1995, Appellants filed their Second Amended Complaint. This complaint incorporated the Pegnatoris' claims and added as defendants the C. Paul Scott and Louise Mary Scott Trust, Paul J. Scott, and Jean Ann Crilley.[6] It otherwise was identical to the Coveys' First Amended Complaint; including the same prayer for relief and the same state law claims. On May 25, 1995, the district court again dismissed the state law claims.

On August 25, 1995, defendant Crilley moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). On September 1, 1995, defendant Scott also moved for dismissal. Because the motions to dismiss relied on matters outside the pleadings, the district court converted them to motions for summary judgment under Fed.R.Civ.P. 56. On November 13, 1995, the district court issued a tentative ruling granting summary judgment to the moving defendants. The court held a hearing on the same date. On November 21, 1995, having concluded that the 1995 HUD regulations applied to Appellants' claims, the district court entered the tentative ruling as its minute order and *sua sponte* entered summary judgment in favor of all the defendants. This appeal followed.

## II. STANDARD OF REVIEW

We review a grant of summary judgment de novo. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). We must determine, viewing the evidence in the light most favorable to Appellants, whether any genuine issues of material fact exist for trial and whether the district court correctly applied the relevant substantive law. *Id.; United States v. City of Hayward*, 36 F.3d 832, 835 (9th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995). We do not weigh the evidence or determine the truth of contested matters; we look only to whether a material factual dispute remains for trial. *See Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir.1996).

---

**5.** The court also consolidated the Covey/Pegnatori case with a similar suit brought against the same defendants by Robert Linn, No. SA CV 94–734. The court refused to consolidate a similar suit brought by the United States on behalf of Susan Mohlenhoff, No. SA CV 94–857. Although Appellants refer to Linn in their briefs, he does not appear to be a party to this appeal. His presence or absence does not alter our review. The United States and the defendants entered into a consent decree in No. 94–857. Mohlenhoff filed a complaint in intervention in No. 94–857, which the defendants moved to dismiss. The district court apparently has not yet ruled on that motion.

**6.** The Trust owned the Park. Scott and Crilley were trustees.

## III. DISCUSSION

### A.

■ In granting summary judgment to Appellees, the district court found that the 1995 HUD regulations applied to Appellants' claims and that the Park qualified as "55 or older" housing under those regulations. After careful consideration, we conclude that the 1995 regulations do not apply retroactively to Appellants' claims.

■ In general, the courts disfavor retroactivity. "[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). Fairness concerns dictate that courts must not lightly disrupt settled expectations or alter the legal consequences of past actions. *See Landgraf v. USI Film Products*, 511 U.S. 244, 265–66, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994); *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855, 110 S.Ct. 1570, 1586, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring) ("The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal.").

In *Landgraf*, the Supreme Court considered the apparent tension between the antiretroactivity principle and the equally longstanding principle that "a court is to apply the law in effect at the time it renders its decision." *Bradley v. Richmond School Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). The Court acknowledged that where legislation does not violate one of several specific constitutional provisions against retroactivity, "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope." *Landgraf*, 511 U.S. at 267, 114 S.Ct. at 1498. The Court then explained that "retrospective" legislation involves more than merely applying a statute "in a case arising from conduct ante-

dating the statute's enactment." *Id.* at 269, 114 S.Ct. at 1499.

■ Cases involving settled contract and property rights, for example, require predictability and stability and are generally inappropriate candidates for statutory retroactivity. *Id.* at 270–72, 114 S.Ct. at 1500. Similarly, the courts presumptively should not apply "statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment." *Id.* at 278, 114 S.Ct. at 1504. Accordingly, the Court provided a framework for approaching retroactivity questions:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at 280, 114 S.Ct. at 1505.

In this case, all of the events at issue occurred before the 1995 HUD regulations took effect.[7] In denying Appellees' first motion for summary judgment, the district court found that triable issues existed as to whether the Park satisfied the "significant facilities and services" requirement, as defined in the 1989 regulations. Appellees did not produce evidence of additional facilities and services to support their later motions for summary judgment (the "Scott/Crilley motions"), but rather submitted evidence that the Park's previously identified facilities and services complied with the 1995 regula-

---

7. In fact, it appears that when the regulations took effect on September 18, 1995, Appellants no longer resided in the Park, Appellees no longer

owned or managed the Park, and the Park had become an all-ages facility.

tions. That the district court granted the Scott/Crilley motions strongly suggests that the 1995 regulations substantially altered the legal consequences of the events giving rise to Appellants' complaint, all of which occurred prior to September 18, 1995.

Moreover, by retroactively relaxing the standard for determining whether the Park, in 1993, provided "significant facilities and services specifically designed to meet the physical or social needs of older persons," 42 U.S.C. § 3607(b)(2)(C)(i), applying the 1995 regulations would substantially impair Appellants' right to recover for any familial status discrimination they may have suffered. These considerations counsel against applying the 1995 regulations to Appellants' case.[8]

Appellees' reliance on *Bradley* and on *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), does not persuade us otherwise. In *Thorpe*, the Court upheld the retroactive application of a HUD circular changing the procedural requirements for eviction. *Id.* at 283, 89 S.Ct. at 527. The Court so held both because the circular established a fairer eviction procedure and "because the prescribed notification [was] essential to remove a serious impediment to the successful protection of constitutional rights." *Id.* The 1995 regulations removed no such barrier. While they arguably provided a "fairer" standard for compliance with the "housing for older persons" exemption, they also may have *created* an impediment to the successful protection of the right to be free from unlawful housing discrimination by relaxing that standard. Equitable considerations such as those present in *Thorpe* do not exist here. Similarly, the 1995 HUD regulations are central to the determination of Appellees' liability; they are not collateral to or separable from Appellants' claims. *See Landgraf*, 511 U.S. at 276–79 & n. 32, 114 S.Ct. at 1503–04 & n. 32

(distinguishing *Bradley* and *Thorpe* from antiretroactivity cases as involving equitable considerations and collateral matters).

*Thorpe* also is unavailing because the Court there held only that the circular should apply to all tenants still residing in the housing facility at the time HUD issued it. *Id.* The Court did not determine in *Thorpe* whether a revised regulation should apply to past events involving parties who, at the time the revisions took effect, no longer resided in, owned, or managed the housing facility.

In *Bradley*, the Court noted its consistent refusal "to apply intervening change to a pending action where it is concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." 416 U.S. at 720, 94 S.Ct. at 2020. Appellees argue that the 1995 regulations do not implicate retroactivity concerns because Appellants had no unconditional right to relief at the time those regulations took effect. Appellees rely on *Hammond v. United States*, 786 F.2d 8, 12 (1st Cir.1986), for the principle that a plaintiff has no "vested" right to a cause of action until it has been reduced to a final judgment.

Justice Scalia, concurring in *Landgraf v. USI Film Products*, forcefully argued against using a "vested rights" criterion to determine whether retroactivity is appropriate. 511 U.S. 244, 289–93, 114 S.Ct. 1522, 1524–25, 128 L.Ed.2d 229 (Scalia, J., concurring). In his view, the "random exceptions" to that criterion indicate its fundamental wrongness. *Id.* at 289–91, 114 S.Ct. at 1524. Moreover, a careful reading of *Hammond* reveals that its "vested rights" analysis applies only to constitutional challenges to statutes eliminating a plaintiff's cause of action. We have relied on *Hammond* in this context. *In re Consolidated United States Atmospheric Testing Litigation*, 820 F.2d 982,

---

8. At least one district court judge has concluded that the 1995 HUD regulations should not apply to cases involving alleged discrimination predating those regulations. *Bocci v. Jurow*, No. C 95–20534 (N.D.Cal. Apr. 5, 1996). In that case, the district court first determined that Congress did not clearly state its intention that the regulations should apply retroactively. *Id.* at 7. The court also concluded that the new regulations might have a pronounced impact on the parties' rights

under the FHA, their lease agreements, or other contracts. *Id.* at 9. The court explained: "Plaintiffs' rights are potentially adversely affected because the change in the law expands the ability of housing providers to claim the 55–or–older exemption, thereby excluding families with children." *Id.* The court therefore declined to apply the 1995 standards to determine whether the defendant housing provider qualified for the exemption.

990–91 (9th Cir.1987) (holding that plaintiff has no constitutionally-protected property right to a cause of action until it has been reduced to a final judgment). This case, however, presents the question not whether the 1995 regulations deprive Appellants of due process or effectuate a "takings" by retroactively eliminating their cause of action, but whether the new regulations may retroactively change the standard for determining whether Appellees may be liable for past actions.

In our view, applying the 1995 regulations retroactively simply because Appellants' claim has not yet been reduced to a judicial determination of liability would gravely undermine the presumption against retroactivity. While the district court did not finally determine the rights and liabilities of the parties when the 1995 regulations took effect, no contingency precluded the court from determining whether Appellees unlawfully had discriminated against Appellants. In other words, Appellants' rights to relief, if any, are "unconditional" because all events necessary to establish those rights (save a judicial decree of liability) have occurred.

Appellees argue that the 1995 regulations do not implicate retroactivity concerns. They point to *Bradley*'s statement that "a court is to apply the law in effect at the time it renders its decision," 416 U.S. at 711, 94 S.Ct. at 2016, and argue that the new regulations simply clarified HUD's previously unworkable definition of the "significant facilities and services" requirement.

Appellees' argument has some merit. Under either the 1989 or 1995 regulations, a housing provider could qualify for the "housing for older persons" exemption only if it provided significant facilities and services designed to meet seniors' needs (or demonstrated that such provision is impracticable and that the housing provided an important housing opportunity for seniors), reserved at least 80% of units for residents ages 55 or older, and published and adhered to policies and procedures demonstrating an intent to provide senior housing. *Compare* 24 C.F.R. § 100.304(b)-(c) (1995) (1989 regulations) *with* 60 Fed.Reg. at 43327–28 (publishing 24 C.F.R. § 100.305) (1995 regulations). The new regulations left the "impracticability" test, the 80% requirement, and the intent requirement virtually unchanged.

The 1995 regulations did, however, substantially alter the standard for determining whether a housing provider offers "significant facilities and services specifically designed to meet the physical or social needs of older persons." Under the 1989 regulations, HUD issued a non-exhaustive list of facilities and services with which a housing provider could qualify for the exemption. 24 C.F.R. § 100.304(b)(1) (1995). The 1995 regulations turned this illustrative list into specific category headings on a "menu" of facilities and services, from which a housing provider need only select ten (at least two items from at least five of twelve categories) in order to qualify. *See* 60 Fed.Reg. at 43328–29 (publishing 24 C.F.R. § 100.306). The difference between these regulations implicates the substantive rights and relationships between housing providers and residents. While the 1989 regulations gave residents some leverage to insist that a housing provider offer additional or more "specifically designed" facilities and services if it wished to qualify for the exemption, the 1995 regulations enabled a provider to demonstrate compliance with both the "significant facilities and services" and intent requirements merely by checking off a sufficient number of items and displaying the checklist. *See id.* at 43329 (publishing 24 C.F.R. § 100.307).

Thus, while the difference between the 1989 and 1995 regulations may appear minimal at first blush, they reflect fundamentally different policy considerations. The 1989 regulations were primarily aimed at implementing the FHA's new protections for families with children "without unfairly limiting housing choices for elderly persons." *See* 54 Fed.Reg. at 3252. The 1995 regulations were designed to "permit communities to ascertain with confidence whether they comply with the Act's requirements." 60 Fed. Reg. at 43326.

We conclude that the 1995 regulations would have a retroactive effect on Appellants' claims. Under *Landgraf*, those regulations therefore should not apply "absent clear con-

gressional intent favoring such a result." 511 U.S. at 280, 114 S.Ct. at 1505.

### B.

Appellees stress that HUD enacted the 1995 regulations to meet Congress's demand that it provide-by April 1993-a less restrictive standard. They argue that because HUD should have issued new regulations even before the alleged discrimination occurred, the 1995 regulations should apply here.

By 1992, Congress determined that HUD's 1989 regulations failed to provide meaningful guidelines for compliance with the "housing for older persons" exemption. *See* H.R. Rep. 91, 104th Cong., 1st Sess. (Mar. 28, 1995) 3 ("The lack of clear guidelines have made it difficult for senior's [sic] communities to qualify for the exemption."). Congress therefore ordered HUD to revise its definition of "significant facilities and services." Housing and Community Development Act of 1992, Pub.L. No. 102–550, 106 Stat. 3883 (Oct. 28, 1992) § 919. However, the language and history of the Housing and Community Development Act provide no indication that Congress intended HUD's new definition of "significant facilities and services" to apply retroactively. In fact, Congress's direction to HUD appears in a single, terse paragraph of that lengthy Act, under the subtitle "Miscellaneous."

Nor do the 1995 regulations expressly speak to their retroactivity. One possible indication that the 1995 regulations might apply to cases predating their enactment appears in § 100.304, as amended:

(a) The provisions regarding familial status in this part shall not apply to housing intended and operated for occupancy by at least one person 55 years of age or older per unit, provided that, *at the time of an alleged violation of the Act,* the housing satisfies the requirements of ... [the new regulations].

(b) With reference to complaints filed pursuant to the Act, this means that the person or entity claiming the exemption must affirmatively prove by a preponderance of evidence *as of the date of an alleged viola-*

*tion of the Act* that the housing meets the requirements of paragraph (a) of this section.

60 Fed.Reg. at 43327 (publishing 24 C.F.R. § 100.304(a)-(b)) (emphasis added). The phrases "at the time of an alleged violation" and "as of the date of an alleged violation" might suggest that HUD intended the regulations to apply to pre-enactment violations. However, a closer reading confirms that the regulations should apply prospectively only. Compliance with section 100.304(a) would turn on whether "the housing *satisfies* " the applicable requirements. *Id.* (emphasis added). Section 100.304(b) would require proof that "the housing *meets* the requirements of paragraph (a)." *Id.* (emphasis added). HUD's use of the present tense to modify the date-of-the-violation language in each paragraph, along with the fact that a present-tense violation by the Park was factually impossible on the date those provisions took effect, indicates that the 1995 regulations should not apply to this case.

Congress and HUD may indeed have found the 1989 regulations difficult to implement and enforce; housing providers apparently found them difficult to follow. *See* H.R. Rep. 91, 104th Cong., 1st Sess. (March 28, 1995) 3. In its August 18, 1995, final rule, HUD stressed that the 1995 regulations did not emasculate the "significant facilities and services" requirement and that housing providers continued to bear the burden of proving their compliance with the FHA and their qualification for the exemption. 60 Fed.Reg. at 43326. Nevertheless, neither Congress nor HUD expressly stated that the new standard should apply to cases arising before its adoption. The 1995 regulations represent a significant departure from the standards and policies predating them. Absent any congressional or administrative indication to the contrary, we conclude that they should not apply retroactively to this case.

### C.

Shortly after the district court entered summary judgment in favor of Appellees and after Appellants filed their notice of appeal, Congress amended the FHA to eliminate the "significant facilities and services" require-

ment from the "housing for older persons" exemption. Pub.L. No. 104–76, 109 Stat. 787 (Dec. 28, 1995) ("P.L.104–76"). Appellees argue that we should apply the FHA as amended, rendering moot the question whether the district court erred in applying the 1995 regulations.

Only one federal court has issued a published decision regarding the "housing for older persons" exemption since Congress passed P.L. 104–76. In that case, the district court determined that the defendant housing provider failed to qualify for the "55 or older" exemption and was liable to the plaintiffs for discriminating against them on the basis of familial status. *Simovits v. Chanticleer Condominium Ass'n,* 933 F.Supp. 1394, 1401–02, 1408 (N.D.Ill.1996). The court based its decision on the facility's failure to meet the 80% requirement and the intent requirement and did not directly address statutory or regulatory changes to the "significant facilities and services" requirement. The court did note that "[t]he amended statute applies to the case at bar because the Association continued its discriminatory conduct ... subsequent to the passage of the new law. Thus, there is no issue of retroactivity in this case." *Id.* at 1401 n. 15.

*Simovits* provides little guidance as to whether P.L. 104–76 should apply retroactively. Also, it is distinguishable from this case because all of the events at issue here occurred before Congress amended the FHA and because this case carries no potential for continuing compliance or discrimination by Appellees.

■ We have discussed at length the considerations counseling against retroactive application of the 1995 regulations. The same analysis persuades us that P.L. 104–76 should not apply to this case. The amended FHA exempts from the prohibition against familial status discrimination numerous housing facilities that previously could not qualify for the "55 or older" exemption. It also provides a defense against money damages for housing providers who attempted in good faith to comply with the FHA. 42 U.S.C. § 3607(b)(5) (as amended). Clearly, applying the amendment would substantially alter the legal rights and obligations of both housing providers and residents.

Moreover, nothing in the language or history of the amendment indicates that Congress intended it to apply to cases predating its enactment. *See* S.Rep. No. 172, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 778 (Nov. 9, 1995); H.R.Rep. No. 91, 104th Cong., 1st Sess. (Mar. 28, 1995). In the absence of express language of congressional intent, the amendment should not apply retroactively. *Bowen,* 488 U.S. at 208, 109 S.Ct. at 471–72; *but see Thorpe,* 393 U.S. at 281 n. 38, 89 S.Ct. at 526 n. 38 ("A change in the law between a nisi prius and an appellate decision requires the appellate court to apply the changed law.").

Finally, applying the amendment retroactively may conflict with the general federal savings statute, which provides that:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109. This provision, adopted in 1947, reversed the common law rule that a statutory change which merely removed a burden on private rights should apply retroactively to prohibit liability for acts antedating the repeal. *See Landgraf,* 511 U.S. at 270–72, 114 S.Ct. at 1500. Section 109 applies to amendments as well as to repeals of statutes. *Korshin v. Commissioner,* 91 F.3d 670, 673 n. 5 (4th Cir.1996); *United States v. Breier,* 813 F.2d 212, 215 (9th Cir.1987). We therefore conclude that the pre-amendment FHA applies to Appellants' claims.

### D.

Having determined that Appellants' claims should be adjudicated under the law in existence at the time of the alleged discrimination, we turn to whether a genuine issue of material fact remains as to the Park's compliance with that law.

The district court denied Appellees' first motions for summary judgment, finding that triable issues remained regarding whether the Park qualified for the "55 or older" exemption. The district court subsequently granted summary judgment based on its application of the 1995 regulations. Since those regulations do not apply to Appellants' claims, summary judgment in reliance on them was inappropriate.

Also, both sides submitted considerable evidence in support of or opposition to the Scott/Crilley motions. We have reviewed all of the evidence and conclude that genuine issues of material fact remain whether the Park satisfied the "significant facilities and services" requirement under the 1989 regulations and whether the Park met the 80% requirement by ensuring that at least 80% of new residents included at least one occupant age 55 or older. We therefore reverse the district court's summary judgment orders and remand for trial.

**REVERSED AND REMANDED.**