Steve ROMINE, on behalf of himself and all others similarly situated, Plaintiff–Appellant,

v.

DIVERSIFIED COLLECTION SERVICES, INC., and Western Union, Defendants–Appellees.

No. 97–15586.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 1998.

Decided Sept. 17, 1998.

Mitchell D. Gliner, Las Vegas, NV and O. Randolph Bragg, Horwitz, Horwitz & Associates, Chicago, IL, for plaintiff-appellant.

Gary R. Goodheart, Jones Vargas, Las Vegas, NV and David G. Russell, Parker, Hudson, Rainer & Dobbs, Atlanta, GA, for defendants-appellees.

Before: HUG, Chief Judge, FERNANDEZ and THOMAS, Circuit Judges.

HUG, Chief Judge:

This case involves the district court's dismissal of Western Union from a class action lawsuit brought by Steve C. Romine ("Appellant") against Western Union and Diversified Collection Services ("DCS"), a debt collection agency, for violations of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ("FDCPA"), which prohibits debt collectors from engaging in abusive, deceptive, and unfair practices. The challenged practice involves Western Union's Automated Voice Telegram ("AVT") service, in which Western Union obtains debtors' telephone numbers by eliciting responses to personal delivery telegrams, then disseminates the unlisted numbers to creditors and collection agencies. The sole issue before us is whether Western Union's activities amount to a direct or indirect attempt to collect a debt, bringing Western Union within the ambit of the FDCPA. The district judge astutely entered 54(b) certification to resolve this legal issue before proceeding with the trial. Fed. R.Civ.P. 54(b). We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse the district court's judgment dismissing Western Union in this action and remand for further proceedings.

I.

*Procedural and Factual Background*

Appellant appeals the district court's order dismissing Western Union pursuant to Fed. R.Civ.P. 12(b)(6) from Appellant's First Amended Class Action Complaint seeking declaratory judgment and statutory damages on behalf of himself and others similarly situated. Appellant alleges that Western Union violated the FDCPA by: (a) failing to inform him that the voice telegram constituted an attempt to collect a debt, 15 U.S.C. § 1692e(11); (b) failing to provide a validation notice as required by the Act, 15 U.S.C. § 1692g(a); and (c) implying a false sense of urgency and using false or deceptive means in an attempt to collect a debt, 15 U.S.C. §§ 1692e & e(10).

DCS, a California-based debt collection company, entered into a service agreement with Western Union for provision of its AVT service, also called "Talking Telegrams." The service agreement was signed under the heading, "Automated Voice Telegram Debtor Notification Services Agreement."

Western Union advertises that its AVT service was "specially developed for the credit and collections industry." Western Union markets the service as a "revolutionary new collections service that will stimulate recover-

ies dramatically." The service stimulates debtor responses by employing telegrams bearing the Western Union name, conveying a sense of urgency. Two Western Union advertisements promise the following:

Talking Telegrams gets results!! Since no one—not even your hard-to-reach account holders—can resist a Western Union Telegram, your contact rates can easily approach 88%. So, to pick up your collections dramatically, pick up the phone and call us about Talking Telegrams—the call no debtor can ignore!

. . . . .

That's the beauty of Talking Telegrams, the revolutionary new collections service that has produced up to an 88% contact rate for a major credit card issuer and a student loan servicer.

Once a debtor calls Western Union to retrieve a telegram, Western Union requires the caller to provide his telephone number, allegedly to "confirm" the caller's identity. Western Union then transmits the previously-unlisted or otherwise unavailable telephone number to creditors or debt collection agencies employing the AVT service. A Western Union advertisement explains the process:

What if you don't have a phone number? We'll send a Western Union letter saying that there is a telegram waiting. When the account holder calls, not only will we deliver your collection message, but we'll obtain the needed phone number for your records.

In the case at bar, the following sequence of events occurred. DCS provided Western Union with Appellant's name and address in September, 1995. The parties have stipulated that neither DCS nor Western Union knew of Appellant's telephone number at that time.

On behalf of DCS, Western Union mailed Appellant a "NOTIFICATION OF PERSONAL DELIVERY TELEGRAM HELD FOR DELIVERY." The notification contained a message stating:

WESTERN UNION HAS A "PERSONAL DELIVERY ONLY TELEGRAM" MARKED FOR VOICE DELIVERY TO YOU. WE CANNOT DELIVER THE MESSAGE BECAUSE YOUR TELE-PHONE NUMBER WAS NOT PROVIDED AND WE CANNOT CONFIRM THAT YOU ARE THE INTENDED RECIPIENT.

The message provided a toll-free number and directed Appellant to contact a Western Union operator to request his telegram. Appellant telephoned Western Union in response to the notification. He was not informed that this was an effort to collect a debt. A computerized caller identification system ("caller ID") recorded his unlisted telephone number. The operator also requested Appellant's name, address, and telephone number, which he provided. After receiving this information from Appellant, the operator read aloud the following debt collection message prepared by DCS:

WE HAVE PREVIOUSLY ATTEMPTED TO CONTACT YOU REGARDING YOUR ELIGIBILITY FOR THE FEDERAL CONSOLIDATION LOAN PROGRAM. IN AN EFFORT TO STRESS THE IMPORTANCE IN CONTACTING YOU, WE HAVE SENT THIS TELEGRAM REQUESTING THAT YOU TELEPHONE OUR OFFICE IMMEDIATELY AT 1–800–766–7617 BETWEEN 11 A.M. AND 7 P.M. PACIFIC STANDARD TIME TO DISCUSS THE ADVANTAGES OF REFINANCING YOUR DEFAULTED STUDENT LOANS WITH NO UP–FRONT COST TO YOU. FEDERAL LAW REQUIRES NOTIFICATION THAT THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION WE OBTAIN FROM YOU MAY BE USED AS A BASIS TO ENFORCE COLLECTION OF THIS DEBT. FROM DIVERSIFIED COLLECTION SERVICES INCORPORATED.

Western Union then mailed Appellant a Mailgram containing a written confirmation of the debt collection message, and provided DCS with Appellant's unlisted telephone number. DCS's debtor collection transaction history shows that DCS subsequently used the newly-acquired telephone number to contact Appellant on several occasions.

The district court entered a judgment dismissing Western Union on the ground that Western Union was not a "debt collector"

subject to the FDCPA, and the judge certified the partial dismissal for immediate appeal pursuant to Fed.R.Civ.P. 54(b).

## II.

### *Standard of Review*

A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is converted into a summary judgment motion where, as here, matters outside the pleadings are presented. Fed.R.Civ.P. 12(c).[1]

A grant of summary judgment is reviewed *de novo. Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir.1997). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *Id.*

## III.

### *Statutory Interpretation*

Appellant contends that the district court erred in concluding that Western Union was not a "debt collector" subject to the FDCPA. The district court determined that Western Union acted merely as a "messenger," providing its services to the general public, including creditors and debt collection agencies. Appellant counters that Western Union's role in contacting him by way of a Western Union telegram, requiring a return call for delivery of the telegram, communicating with him personally, obtaining his unlisted telephone number, and forwarding the unlisted number to DCS for use in collection efforts brings Western Union within the ambit of the FDCPA. The FDCPA defines "debt collector" as:

[A]ny person who uses any instrumentality of interstate commerce or the mails in any

business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6). Appellant concedes that Western Union does not qualify as a debt collector under the first prong of the FDCPA definition because debt collection is not the principal purpose of Western Union's business. Appellant argues instead that Western Union regularly collects or attempts to collect debts, directly or indirectly, and therefore satisfies the definition's second prong. As evidence of Western Union's debt collection activity, Appellant points to the fact that the company: (a) aggressively markets its AVT service as a "revolutionary new collections service"; (b) contacts debtors directly; (c) transmits telegrams as a vehicle for eliciting responses and procuring debtors' telephone numbers; (d) relays debt collection messages provided by DCS; and (e) supplies debtors' previously-unknown telephone numbers to creditors and debt collection agencies.

▮ The interpretation of a statute is a question of law reviewed *de novo. Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir.1997). We determine the plain meaning of a statute by looking at the particular language at issue, as well as the language and design of the statute as a whole. *Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507, 1512 (9th Cir.1994) (citing *Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1342 (9th Cir.1990)). In the absence of statutory definition, a statutory term will be accorded its ordinary meaning. *Northwest Forest Resource v. Glickman*, 82 F.3d 825, 833 (9th Cir.1996).

In order to determine whether Western Union's activities, taken together, amount to a direct or indirect attempt to collect a debt, we first look to the plain language of the FDCPA. *See, e.g., Heintz v. Jenkins*, 514 U.S. 291, 294, 115 S.Ct. 1489, 131 L.Ed.2d

---

1. Fed R. Civ. P. 12(c) reads, in pertinent part:

    If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable

    opportunity to present all material made pertinent to such a motion by Rule 56. *Id.*

    In the case at bar, matters outside the pleadings include a statement of stipulated facts and a listing of FCC tariffs. Western Union included the tariff information as part of its motion to dismiss.

395 (1995)(interpreting the plain language of the FDCPA and according words and phrases their ordinary and natural meaning). We note first that the Act regulates the conduct of "any person" in "any business" whose (1) principal purpose is debt collection, or (2) who regularly collects or attempts to collect debts, directly or indirectly. 15 U.S.C. § 1692a(6). Had Congress intended to limit the Act to licensed or registered collection agencies, it would have confined the statutory language to businesses for which debt collection is the "principal purpose." Although the legislative history notes that the "primary persons intended to be covered are the independent debt collectors," it also emphasizes that "[t]he term 'debt collector' is defined to include 'all third parties' who regularly collect consumer debts for others...." S.Rep. No. 95–382, 95th Cong. 1st Sess. 2 (1977), *reprinted* in 1977 U.S.C.C.A.N. 1697; 1701.

The Supreme Court has recognized that one need not gain possession of a debt, or personally benefit financially from the satisfaction of a debt, in order to assume liability as a "debt collector" under the FDCPA. In *Heintz,* the Court clarified that "debt collectors" may include attorneys litigating cases on behalf of their clients: "[L]itigating ... seems simply one way of collecting a debt." *Heintz,* 514 U.S. at 297, 115 S.Ct. 1489. "In ordinary English, a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly 'attempts' to 'collect' those consumer debts." *Id.* at 294, 115 S.Ct. 1489. *See also Jenkins v. Heintz,* 25 F.3d 536, 539 (7th Cir.1994) ("[I]n drafting a broad statute, Congress entered all areas inhabited by debt collectors, even litigation."). The Fourth Circuit implicitly ascertained that the ultimate possession of the debt is not dispositive when it ruled that filing warrants on behalf of creditors is an indirect means of debt collection subject to the FDCPA. *Scott v. Jones,* 964 F.2d 314, 316 (4th Cir.1992).

Western Union argues that because it is a common carrier engaged in the business of interstate transmission of messages, its debt collection-related activities do not satisfy the FDCPA's requirement that such activities must be "regular." The legislative history of the FDCPA provides some guidance as to when debt collection activities are to be considered regular:

> The requirement that debt collection be done "regularly" would exclude a person who collects debt for another in an isolated instance, but would include those who collect for others in the regular course of business.

S.Rep. No. 95–382, 95th Cong. 1st Sess. 2 (1977), *reprinted* in 1977 U.S.C.C.A.N. 1695, 1697–98. As Western Union's AVT service is well-publicized and governed by tariffs formally submitted to the FCC, we find that the service cannot be characterized as an isolated occurrence. Although Western Union's argument that it is a common carrier indicates that debt collection is not the "principal purpose" of the business, the company's debt collection functions are sufficiently regular to satisfy the second prong of the FDCPA definition. Western Union's advertisements lend support to our conclusion:

> AVT is being used successfully by scores of firms, including servicers and direct lenders of: Student loans, Mortgages, Consumer and installment loans, Credit cards, Retail charge accounts. Whether to 1,000 or 100,000, Western Union's AVT service can get your message delivered fast and with unsurpassed impact.

■ Although the term, "indirectly," is not defined in the statute, the legislative history, or the case law,[2] its inclusion in the FDCPA must be taken into account. We take judicial notice of a 1996 Federal Trade Commission (FTC) letter indicating that a service similar or identical to Western Union's AVT service amounted to an indirect form of debt collection.[3] The letter was not published at the

---

**2.** Although no reported decisions have defined the term, "indirectly," some courts have held practices to be within the reach of the FDCPA on the implicit or explicit presumption that they were indirect forms of debt collection. As noted earlier, the Supreme Court has determined that lawyers, even in a litigating role, can be debt collectors subject to the FDCPA. *Heintz,* 514

U.S. at 299, 115 S.Ct. 1489. In *Scott v. Jones,* mentioned above, the Fourth Circuit treated the filing of warrants on behalf of creditors as an indirect means of debt collection. *Jones,* 964 F.2d at 316.

**3.** FTC staff letter to Christopher Stanley, Esq., September 17, 1996, *reprinted in* Robert J.

time of briefing and argument before the district court. At trial and on appeal, the parties instead discussed a 1983 letter which we find to be irrelevant as the FTC had not been informed of the range of activities involved in the service at issue.[4] The more recent and relevant 1996 FTC staff letter reads as follows:

> Reference is made to your letters ... concerning a "Telegram Notification" sent by your client, a telecommunications company, to consumer debtors ... The question is whether your client is covered by the Fair Debt Collection Practices Act (FDCPA). In order for a service provided by your client to fall within the scope of the Fair Debt Collection Practices Act, your client must be covered, i.e., it must be a "debt collector" under Section 803(6). That Section defines a "debt collector" as someone who "... regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another" (emphasis FTC's). As part of your client's service to debt collection agencies or credit providers, it proposes to sent (sic) a letter to alleged debtors. The purpose of the letter is two-fold: first, to alert recipients of the letter to a voice-mail message left in their names at an 800 number, and second, to obtain recipients' telephone numbers so that they can be contacted by a creditor or collector in connection with the collection of debts allegedly owed by them to third parties. To the extent that the letter serves a collection function (albeit an indirect collection function), which we believe it does, it brings your client within the coverage of the FDCPA.
>
> Since your client would be covered by the Act, its collection communications would have to comply with the Act. Among other

things, this means that the letter referred to above must disclose that your client is attempting to collect a debt and any information obtained will be used for that purpose, in accordance with Section 807(11) of the FDCPA.[5]

## IV.

### *Western Union's Activities*

█ Although the FTC letter is non-binding, we find it persuasive. We determine that Appellant's pleadings and other materials in the record leave open the possibility that Western Union's activities amount to an indirect attempt to collect a debt. As the company's advertisements acknowledge, the AVT service was "specially developed for the credit and collections industry." The dual role of the service is to (1) retrieve unavailable telephone numbers for creditors and debt collection agencies; and (2) to catalyze debt collection activity through telegrams bearing the Western Union name. As noted above, Western Union's advertisements state that its "revolutionary new collections service" will "stimulate recoveries dramatically":

> **Make Contact**—AVT penetrates virtually any screen erected by debtors so you can achieve contact with even the most "hard-to-reach."
>
> **Update Records**—AVT quickly and inexpensively updates the name, address and telephone number of delinquent accounts so you can continue your own collection efforts.
>
> **Collect Debts**—The urgency of the Western Union name underscores the seriousness of the situation. So AVT actually helps stimulate incremental recoveries from debtors who have not responded to previous collection attempts.

Hobbs, *Fair Debt Collection: Consumer Credit and Sales Legal Practice Series* Appx. 1, 141–42 (1997 Supplement). The service described in this letter is virtually identical to Western Union's AVT service, except that the AVT service, at least on some occasions, employs a live operator to deliver the debt collection message to the debtor. Appellant communicated with a live operator in the present case.

4. FTC staff letter to Basil J. Mezines, Esq. of November 14, 1983, *reprinted in* Robert J. Hobbs, *Fair Debt Collection: Consumer Credit*

and *Sales Legal Practice Series* Appx. 1, 651–52 (3d. Ed.1996). The author of the 1983 staff letter, which concerned activities by Western Union, was not advised of Western Union's retrieval of the debtor's previously unknown telephone number and Western Union's provision of that number to the collection agency for use in its ongoing collection efforts. Therefore, we find that this letter is of no persuasive value.

5. FTC staff letter to Christopher Stanley, Esq., September 17, 1996, note 3 *supra*.

Western Union contends that, in requiring telegram recipients to release their telephone numbers, it is merely "confirming" the numbers in compliance with the FCC-approved tariff governing the AVT service.[6] We find this argument to be disingenuous. As Appellant notes, "[o]ne cannot 'confirm' what one does not know." In the case at bar, the parties have stipulated that neither Western Union nor DCS knew Appellant's telephone number prior to receiving his response to the telegram.[7] To confirm is to corroborate, and one cannot corroborate a telephone number without a basis for comparison. The most that can be learned from Western Union's alleged confirmation process is that the number reported verbally by Appellant matched the number on Western Union's caller ID screen. This does not confirm the identity of the caller, but merely shows that the caller has candidly reported the number from which he telephoned. Because obtaining the telephone number does not serve to identify the calling party, there is no essential reason for requiring disclosure of the number. The chief purpose of the alleged "confirmation" process is to obtain unlisted or otherwise unavailable telephone numbers which Western Union then turns over to creditors and debt collection agencies. The fact that the tariff governing the AVT service requires confirmation of the telephone number is of little persuasive value to us, as common carriers such as Western Union design and file their own tariffs, which subsequently are subject to approval by the FCC. 47 U.S.C. § 203. The tariff delineates the AVT service but does not insulate the service from the requirements of the FDCPA.

Lending support to our conclusion is the curious manner in which Western Union conveys the initial AVT message to debtors.

The initial message sent to Appellant included a "Notification Of Personal Delivery Telegram Held For Delivery." However, in lieu of waiting for a response, the notification concurrently informed the recipient: "We Cannot Deliver The Message Because Your Telephone Number Was Not Provided And We Cannot Confirm That You Are The Intended Recipient."

It appears from the record that Western Union's AVT delivery procedure, including the above notification process, differs significantly from Western Union's standard procedures for personal telegram delivery. According to the evidence before us, requiring a telephone number for "confirmation" appears to be unique to the AVT service. Other personal message delivery services described in the record do not impose the same requirement. For example, the tariff governing Western Union's "Personal Delivery Only" messages simply requires that the envelope is plainly marked "Personal." Tariff F.C.C. No. 1 § 3.4.1.(C)(i). The tariff governing telephone-delivered messages marked "Personal" requires only that the recipient identify herself or himself as the addressee. *Id.* at § 3.4.1(C)(ii). If a customer directs Western Union to ensure that a message is received by a particular addressee and by no one else, the message is marked "Personal Delivery Only" and hand delivered to the addressee. *Id.* at § 3.4.1(C)(iii). This adds further support to our determination that Western Union's obtaining of phone numbers through the AVT service is for the purpose of dissemination to debt collectors rather than "confirming" the identity of telegram recipients.

Furthermore, there is nothing in the tariffs authorizing the transmission of telegram recipients' telephone numbers to creditors

---

**6.** The following tariff governs Western Union's AVT service, otherwise designated as "Inbound Services":

> The Company shall send a Company generated letter to the Intended Recipient at the address provided by the Customer indicating that the Company has an Automated Voice Telegram Message to deliver and asking the Intended Recipient to telephone a toll-free 800 number to receive the Message. The Company shall (i) receive all such telephone calls and confirm the identity, present address, and telephone number of the Intended Recipient and the Message number contained in the Company

generated letter, and (ii) deliver the Automated Voice Telegram Message to the Intended Recipient, confirming via Mailgram in the manner set forth above for Outbound Services. Tariff F.C.C. No. 1, § 3.4.1(D)(ii)(a).

**7.** DCS's Debtor Collection Transaction History reflects the acquisition of Appellant's unlisted telephone number:

Western Union Return Hit: Western Union Hit; Western Union Hit: W. Union Ph: (702) 656-7676; Debtor New Work telephone number; W. Union Ph: (702) 656-7676.

and debt collection agencies such as DCS. Quite significantly, Western Union's unauthorized dissemination of debtors' telephone numbers appears to violate FCC rules applying to carriers employing 800 numbers and other automatic number identification ("ANI") services. FCC rules governing ANI services prohibit the reuse or sale of a consumer's telephone number and billing information in the absence of the consumer's affirmative consent. 47 C.F.R. § 64.1602(a)(2)(i)-(ii).[8] Carriers using ANI services, such as Western Union, may only use consumer telephone numbers to perform "the services or transactions that are the subject of the (calling party's) call," or to offer a product or service "directly related to" products or services which the calling party has previously obtained from the carrier. *Id.* at § 64.1602(a)(1) & (3)(i). Carriers are also required to notify consumers of the restrictions on the reuse or sale of calling party information. *Id.* at § 64.1602(b)(2). In what appears to be a transparent attempt to circumvent these rules, Western Union asks consumer debtors to report their numbers verbally while at the same time capturing the numbers on a caller ID screen.

## V.

### Conclusion

Western Union argues that subjecting it to liability under the FDCPA would bring a host of service providers within the statute's reach, including mailing services, private investigators, skip tracers, online personal locator services, and other services that aid or facilitate the collections process. We will not say here that such services could never be considered debt collectors under the FDCPA. That determination would depend upon the nature of the activities in the individual case. The case law indicates that an organizational label is insufficient to insulate a party from liability under the statute. *See e.g., Jenkins,* 25 F.3d at 539 (defendant's activities rather than formal status as a collection agency determine whether defendant is a "debt collector" under the FDCPA).

We conclude, however that Western Union's activities go beyond mere information gathering or message delivery, and are of the type that the FDCPA was designed to deter. The purpose of the FDCPA is to limit harassing, misleading, and fraudulent contacts and communications with or about consumer debtors. The stated purpose of the Act is to "protect consumers from a host of unfair, harassing, and deceptive debt collection practices...." S.Rep. No. 95–382, 95th Cong. 1st Sess. 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1696. Most of the "collection abuses" outlined in the legislative history involve improper contacts with consumer debtors.[9]

In conjunction with its role in contacting debtors and obtaining and forwarding telephone numbers, another significant element is Western Union's advertised role in catalyzing debt collection by conveying a sense of urgency through the use of Western Union telegrams.[10] We reverse the summary judgment and remand for further proceedings.

**REVERSED and REMANDED.**

---

8. 47 C.F.R. § 64.1602(a) provides, in relevant part:
   (a) Any common carrier providing Automatic Number Identification or charge number services on interstate calls to any person shall provide such services under a contract or tariff containing telephone subscriber information requirements that comply with this subpart. Such requirements shall:

   (2) Prohibit such person from reusing or selling the telephone number or billing information without first
   (i) Notifying the originating telephone subscriber and,
   (ii) Obtaining the affirmative consent of such subscriber for such reuse or sale;....

9. The FDCPA notes that "[c]ollection abuse takes many forms, including obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process." S.Rep. No. 95–382, 95th Cong. 1st Sess. 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1696.

10. This circuit has ruled on the practice of using telegrams in debt collection. In a case involving Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which preceded the the FDCPA, we upheld a Federal Trade Commission ("FTC") order prohibiting a collection agency from "using or placing in the hands of others for use, envelopes, letters, forms, or any other materials which by simulating telegrams or other methods or forms or types of communication

FERNANDEZ, Circuit Judge, dissenting:

Western Union's behavior was not commendable by any means. However, I do not agree that it acted as a debt collector, even indirectly. All Western Union did was transmit *the* debt collector's message and obtain the debtor's phone number for the debt collector. It did not in some roundabout way collect a debt. The most it did was use a devious means to collect the debtor's telephone number, but telephone number collection is not debt collection.

Perhaps Romine has a cause of action for Western Union's cynical trading on its hitherto good name. But an action under the FDCPA is not it. In fine, given the rebarbative nature of Western Union's actions, I have a great deal of sympathy for the result which Romine desires, but I am unable to embrace it.

Thus, I respectfully dissent.

misrepresent the nature, import, or urgency of any communication." *Trans World Accounts, Inc. v. Federal Trade Commission,* 594 F.2d 212, 215 (9th Cir.1979). We agreed with the FTC that the use of a so-called "Trans–O–Gram" or telegram format for debt collection purposes was a deceptive practice under the FTC Act. *Id.* at 216.