**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**OMEGA CHEMICAL CORP.; Omega Refrigerant Reclamation Corporation,
Defendants–Appellants,**

and

**Dennis O'Meara, Defendant.**

**No. 96–56704.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 4, 1998.

Decided Sept. 24, 1998.

Anthony Michael Glassman, Lori A. Nielsen, Glassman, Browning & Saltsman, Beverly Hills, CA, for defendants–appellants.

John T. Stahr, United States Department of Justice, Environment and Natural Resources Division, Washington, DC, for plaintiff–appellee.

---

Before: HUG, Chief Judge,
BOOCHEVER and KOZINSKI, Circuit
Judges.

HUG, Chief Judge:

In this case, we determine whether the district court erred in concluding that Appellants, Omega Chemical Corporation et al. ("Omega"), unreasonably failed to comply with the access and entry provisions of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9604(e). Although the record indicates that Omega provided the Environmental Protection Agency ("EPA") with access to its property ("the Site") throughout the period for which penalties were assessed, the company declined to sign a "voluntary" consent form granting EPA unconditional access to the property. The district court granted EPA's motion for partial summary judgment and entered judgment in favor of EPA. The court determined that Omega violated CERCLA's requirements from April 10, 1995, through June 26, 1995, assessing a civil penalty of $2,500 for each of the 78 days of the alleged violation, for a total of $195,000. We conclude that failure to provide unconditional written consent is not punishable by civil penalties under CERCLA, 42 U.S.C. § 9604(e)(5)(B). Because Omega consistently provided EPA with access to its property, a fact that neither party disputes, we determine that Omega did not violate 42 U.S.C. § 9604(e).

We reverse the judgment of the district court.

## I.

### Factual Background

Omega, owner of a business in Whittier, California, operated a spent solvent recycling facility on the Site from 1976 to 1991. In January 1995, EPA initiated sampling and investigative activities to assess alleged hazardous wastes. In February 1995, EPA issued a Notice of Federal Interest, informing Omega and other potentially responsible par-

ties ("PRPs") of a release or threat of release of hazardous substances at the Site.

In April 1995, EPA informed Omega that it would take over the primary responsibility for the removal action. EPA requested that Omega sign a written consent form giving EPA and the PRP group unconditional access to the Site. The consent form included the following language:

This written permission is given by me voluntarily with knowledge of my right to refuse and without threats or promises of any kind.

On May 9, 1995, EPA issued Administrative Order 95-15 outlining its response plans for the Site and directing compliance from Omega. The Order noted that if Omega wished to deviate from any approved plan or schedule, it must submit a written request to EPA outlining the proposed modification and its basis. The Administrative Order also provided an "Opportunity to Confer," scheduling an optional meeting between Omega and EPA in Long Beach, California. The Order noted that regardless of whether a conference was held, Omega may submit, in writing, any information, arguments, or comments in response to the Order.

Omega met with EPA in Long Beach on May 24, 1995, and subsequently submitted a letter to EPA and the PRPs outlining its objections to the Administrative Order. The letter noted that the objections were filed in accordance with instructions of EPA officials at the Long Beach meeting. Omega noted its "intent to comply" with those parts of the Order that were within its physical and financial ability, reserving the right to object to "those portions of the Order which are beyond or in excess of the legal authority of the agency." The letter concluded:

Without waiving any objections with respect to un-consented to searches under the 4th Amendment of the United States Constitution, and without granting consent herein, the ORDER will be complied with so long as such information is not used in the prosecution of any action against any Respondent or otherwise. Inasmuch as this is an order to comply under an imminent and substantial endangerment, Respondents believe it is prudent and neces-

sary to cooperate without waiving such statutory and constitutional rights as they may have.

Respondents will provide access consistent with and subject to the ORDER, saving all objections as stated above.

The letter noted that "[r]espondent refers, without limitation, to events arising out of an importation of CFC's [chlorofluorocarbons] from Europe during the period of July 1994 to the present."

Omega alleges in a Declaration that it subsequently was the target of a federal criminal investigation pertaining to the illegal importation of CFC's, which are banned from the United States due to their ozone-depleting effects. Omega asserts that the response to the Administrative Order was motivated by a concern that voluntary written consent would constitute a waiver of its constitutional rights in connection with the anticipated criminal investigation.

Omega's objection letter resulted in a flurry of correspondence between Omega, EPA, and the PRP group. In a June 13, 1995 letter to EPA's Assistant Regional Counsel, Omega's attorney indicated:

We are acting consistent with the Order and plan to do so in the future. We are acting subject to the Order, and based on our response that should be clear. Now everyone is indicating that there is some sort of agreement which is needed for me to grant access to the site.... Had no one ever raised this issue about access it would have never been a problem for Omega and therefore everything would have resolved itself smoothly and rapidly. I assume that is what everyone wants.

In a fax dated the same day to the counsel for the PRP group, Omega's counsel noted:

[M]y clients are slightly mystified as to why one needs a Presidential 106 Order and a criminal search warrant to come on a site where no one is resisting.

EPA stated in a subsequent correspondence that it would interpret Omega's failure to sign its consent form as a failure to consent to unconditional access to the Site for the removal action. In a return correspondence to EPA on June 15, 1995, Omega's counsel stated:

I have just received your [correspondence] regarding consensual access to the site. I repeat: access is addressed in Paragraph 32 of the Order 95–15 and Respondents will act consistent with the Order.[1] Consensual access is not something that EPA may coerce ... any more than you can gain consensual access through the powers vested in a search warrant. Such attempts at coercion shall in the future be considered as such.... We will provide access as directed by Order 95–15.

Also on June 15, 1995, in a fax to the attorney for the PRP group, Omega's counsel wrote that he would be expecting the group to enter the Site to begin removal activities; stating, "[w]e look forward to working closely with your Group now and in the future to resolve our common concerns." On June 21, 1995, Omega's counsel faxed the following note to the United States Attorney's Office:

I was informed this afternoon ... that you intend to seek an administrative search warrant before a federal magistrate based on the notion that Omega Chemical is resisting providing access under the 106 Order.... Although I don't know when you are going to be seeking this warrant, I would like to be present to give my side of this matter and to inform the magistrate of some of the surrounding circumstances in this rather strange case.

As I told you this afternoon and as I have repeatedly told [EPA's attorney], we are not denying anyone access, but are provid-

---

1. Paragraph 32 of Administrative Order 95–15, which Omega agreed to abide by, reads as follows:

Respondents, Omega Chemical Corporation and Dennis O'Meara, shall provide access to the Site and participate and cooperate with the Respondents for the performance of the work under this Order. The Respondents shall provide access to the Site to U.S. EPA employees, contractors, agents, and consultants at reasonable times, and shall permit such persons to be present and move freely in the area in order to conduct inspections, including taking photographs and videotapes of the Site, to do clean-up/stabilization work, to take samples, to monitor the work under this Order, and to conduct other activities which the U.S. EPA determines to be necessary.

ing access consistent with the 106 Order, reserving our rights, and seeking to preserve any defenses which may be present.

Seeking a search warrant to enter on and to perform certain works at the Omega Chemical property ... is totally unnecessary in my estimation, and is concocted to give the impression that Omega is not complying.

On June 26, 1995, EPA obtained an administrative warrant to perform Phase I of the removal action. Removal activities were initiated at the Site on the following day, pursuant to the Phase I work plan previously completed.

On July 19, 1995, EPA sent Omega another letter requesting Omega's written consent for unconditional access to the Site for the purpose of implementing Phase II of the removal action. The letter again advised Omega that its failure to execute the consent form would be interpreted as a denial of consent to unconditional access.

In October 1995, EPA, in conjunction with the U.S. Customs Service, executed a criminal search warrant on Omega's premises seeking financial and other records relating to the storage and handling of CFCs. In December 1995, Omega was served with a federal grand jury subpoena requesting records pertaining to waste generated by Omega's CFC reclamation machinery. In January 1996, U.S. Customs Agents served a federal grand jury subpoena on Omega requesting additional financial records relating to the importation of CFCs.

In its final judgment and order entered on September 6, 1996, the district court determined that from April 10, 1995, through June 26, 1995, Omega had "unreasonably failed to comply" with CERCLA's provisions authorizing EPA entry onto its property. April 10, 1995 is the date that Omega sent its initial letter to EPA declining to provide unconditional written consent. June 26, 1995, is the date that EPA obtained an administrative warrant in anticipation of Phase I of the removal action.

## II.

### Standard of Review

A grant of summary judgment is reviewed *de novo. Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir.1997). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *Id.*

## III.

### EPA's Access to the Omega Site

The district court decision focused primarily on EPA's authority to enter upon Omega's property, which was not in dispute in this case. Neither party has questioned the existence of an "imminent and substantial" endangerment or the appropriateness of an EPA response action under 42 U.S.C. § 9604(a)(1)(B). The three questions before us are: 1) whether Omega provided EPA with access to its property during the period for which the district court assessed civil penalties; 2) whether Omega's failure to provide unconditional written consent amounted to an actionable denial of CERCLA's access and entry provisions, 42 U.S.C. § 9604(e); and 3) if Omega's failure to provide "unconditional" written consent constituted noncompliance with CERCLA, whether such noncompliance was reasonable and therefore exempted from civil penalties under 42 U.S.C. § 9604(e)(5)(B).

In order to determine whether Omega complied with CERCLA's access and entry provisions, we first examine whether Omega provided EPA with access to the Site during the penalty period. EPA's Complaint alleges that Omega "unreasonably failed and/or refused to provide the access requested on numerous occasions...." The Complaint also states that Omega's president "interfered with access to the Site," and requests that Omega be enjoined from "obstructing, impeding, or otherwise interfering with entry and access by EPA." EPA's Motion Request-

ing an Order in Aid of Access asserted that Omega had consistently obstructed the United States' efforts to enter the Site.

Omega counters that it consistently allowed EPA access to its property, and that EPA maintained a presence on the Site throughout the penalty period. According to the uncontradicted Declaration of Gordon Pal, an Omega administrator, EPA representatives initiated environmental assessment and investigatory activities on the Site in February 1995. The Pal Declaration indicates that members of EPA's Technical Assistance Team conducted activities at the Site on a regular basis from February through September 1995. EPA's initial activities evidently were directed toward the preparation of the Action Memo which EPA issued on May 1, 1995, the Administrative Order issued by EPA on May 9, 1995, and EPA's Phase I Work Plan, which was completed in June 1995.

The record confirms Omega's assertion that Site access was provided throughout the penalty period. EPA's own work and progress reports support Omega's position. The Declaration of EPA's On–Scene Coordinator, Richard Martyn, indicates a substantial on-site presence by government representatives and contractors during and beyond the penalty period. According to the Martyn Declaration, EPA's Technical Assistance Team entered the premises on January 19, 1995, to conduct an assessment of the Site. Photos from this inspection are included in the record. A letter from a Technical Assistance Team member notes that on February 7, 1995, EPA directed the team to review a Site stabilization workplan and to begin on-site monitoring of Omega's overpacking/stabilization activities. EPA's May 1, 1995 Request for a Removal Action noted that a preliminary assessment of the Site had taken place. The document indicated that EPA's Technical Assistance Team had been carrying out daily Site inspections, which later were conducted on a weekly or semi-weekly basis. This is supported by the Martyn Declaration, which mentioned sampling from soil, ground-

water, and drums at the Site. The Martyn Declaration noted that EPA's contractor had observed leaking drums on the Site "as recently as July 25, 1995."

With the exception of a disputed one-day incident occurring after the penalty period,[2] EPA has provided no evidence indicating that Omega physically obstructed access to the Site. Nowhere in its brief does EPA suggest that the agency or others involved were prevented from entering onto the property. At oral argument before the panel, counsel for EPA acknowledged that Omega never barred access to the Site during the period for which civil penalties were assessed.

### IV.

### *Omega's Refusal to Sign a "Voluntary" Consent Agreement*

The central question presented in this case is whether the compliance provisions of CERCLA's access and entry requirements, set forth in 42 U.S.C. § 9604(e)(5), authorize civil penalties for a site owner's failure to provide unconditional written consent to entry, where the facts indicate that the landowner consistently has provided physical access to the site.

The district court determined that Omega's refusal to consent to EPA's written requests for access amounted to an "attempt[ ] to place restrictions on EPA's access authority." EPA argues in its brief that "[i]t is the provision of legal consent, not a vague pledge of cooperation, which provides EPA with the needed certainty and protection to accomplish a cleanup." According to EPA, an interpretation of CERCLA's access and entry provisions that did not require formal consent would lead to situations where a landowner "could easily withdraw such cooperation at any time, even at the most critical times of a hazardous substance removal...." EPA further argues that Omega's imposition of conditions amounted to a violation of CERCLA and its implementing regulations,

---

**2.** There is one disputed contention that Omega interfered with access to a warehouse for a single day, however, because the alleged event occurred after the period for which civil penalties were assessed, that factual dispute is immaterial to this case.

as well as EPA policy guidelines on site access.

Omega responds that its refusal to provide unconditional written consent did not interfere with EPA's access to the Site, and that signing a "voluntary" consent form is not required by CERCLA. Omega characterizes the case before us as "an action regarding the legal difference between opening a door and signing a piece of paper." Omega argues that while 42 U.S.C. § 9604(e)(5) requires EPA to seek a landowner's consent prior to seeking an administrative or judicial order mandating compliance, it does not authorize penalties against a landowner who provides access but declines to sign a written consent form.

■ Nowhere in the statute or the implementing regulations can we find language requiring unconditional written consent in response to requests for access, entry, or inspection. The statute states that if consent is not granted, EPA may seek an administrative order or court order directing compliance with a request for entry. 42 U.S.C. § 9604(e)(5).[3] Likewise, CERCLA's implementing regulations specify that if consent is not provided, the agency may seek an administrative order or court order directing compliance. 40 C.F.R. § 300.400(d)(4)(i). Section 9604(e)(5)(B) of the statute imposes penalties for "noncompliance" against any person who "unreasonably fails to comply with the provisions of paragraph (2), (3) or (4)" or with an order directing compliance with those paragraphs. *Id.* Because paragraphs (2), (3) and (4) authorize access, entry, and inspection,[4] the most logical reading

3. 42 U.S.C. § 9604(e)(5), titled "Compliance Orders," pertains to compliance with requests for entry, access to information, or inspection and sampling. The section states, in pertinent part:
(5) Compliance Orders
  (A) Issuance
    If consent is not granted regarding any request made by an officer, employee, or representative under paragraph (2), (3) or (4) [pertaining to access to information, entry, inspection and sampling], the President may issue an order directing compliance with the request. The order may be issued after such notice and opportunity for consultation as is reasonably appropriate under the circumstances.
  (B) Compliance
    The President may ask the Attorney General to commence a civil action to compel compliance with a request or order referred to in subparagraph (A). Where there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant, the court shall take the following actions:
    (i) In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.
    (ii) In the case of information or document requests or orders, the court shall enjoin interference with such information or document requests or orders or direct compliance with requests or orders to provide such information or documents unless under the circumstances of the case the demand for information or documents is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

The court may assess a civil penalty not to exceed $25,000 for each day of noncompliance against any person who unreasonably fails to comply with the provisions of paragraph (2), (3) or (4) [authorizing entry, inspection, and access to information] or an order issued pursuant to subparagraph (A) of this paragraph.
42 U.S.C. § 9604(e)(5).

4. Paragraphs (2), (3) and (4) of § 9604(e) provide in pertinent part:
  (2) Access to Information
    Any officer, employee, or representative [of the President] may require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information or documents relating to such matter:
    (A) The identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a vessel or facility or transported to a vessel or facility.
    (B) The nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a vessel or facility.
    (C) Information relating to the ability of a person to pay for or to perform a cleanup. In addition, upon reasonable notice, such person either (i) shall grant any such officer, employee, or representative access at all reasonable times to any vessel, facility, establishment, place, property, or location to inspect and copy all documents or records relating to such matters or (ii) shall copy and furnish to the officer, employee, or representative all such documents or records, at the option and expense of such person.

of the statute indicates that "noncompliance" results from a failure to allow access, entry, or inspection. 42 U.S.C. § 9604(e)(2), (3) and (4). That is not the case here.

EPA's policy directive on entry and access under CERCLA, promulgated by the Office of Solid Waste and Emergency Response ("OSWER directive"), is permissive rather than mandatory on the issue of consent. The directive recommends that:

> EPA should, in the first instance, seek to obtain access through consent. Entry on consent is preferable across the full range of onsite activities. If consent is denied, EPA should use judicial process [warrant or court order] or an administrative order to gain access.

OSWER Directive No. 9829.2, Entry and Continued Access Under CERCLA (1987). Nothing in the OSWER language suggests that consent is mandatory or that signing a written form is an essential element of consent. Consent is merely preferred.

The OSWER directive clarifies that "noncompliance" with an administrative order means failure to provide access, entry, or inspection, rather than failure to provide written consent, as EPA would contend. The directive states that "[i]f, following issuance of an administrative order, the siteowner continues to refuse *access* to EPA, the order may be enforced in federal court" (emphasis added).

Here, EPA received an administrative order and invoked the judicial process by obtaining a warrant. We note that these mechanisms provide the certainty that EPA, the PRP's, and their contractors desire for undertaking response actions under CERCLA.

As the OSWER directive acknowledges, consent, alone, is not a prerequisite to providing certainty, as consent may be withdrawn at any time:

> In certain circumstances ... the Region should consider obtaining judicial authorization or issuing an administrative order in addition to obtaining consent. For example, where uncertainty exists whether a siteowner will continue to permit access over an extended period, reliance on consent alone may result in a substantial delay if that consent is withdrawn.

*Id.*

We find EPA's position to be paradoxical. EPA's consent forms state that consent is provided "voluntarily with knowledge of my right to refuse without threats or promises of any kind." Yet, EPA asserts that Omega's failure to sign the form and provide unconditional "voluntary" consent is punishable by civil penalties under 42 U.S.C. § 9604(e)(5)(B). Either the form is genuinely voluntary, in which case civil penalties should not attach, or the form is mandatory, which is a requirement that cannot be found anywhere in CERCLA or its implementing regulations. We have found no case law indicating that the denial of unconditional written consent violates CERCLA when a site owner nevertheless has provided access to his property.

■ EPA further contends that Omega's conditions represent an actionable failure to comply with CERCLA's access and entry provisions. As noted above, Omega agreed to provide access consistent with the Administrative Order "so long as such information

---

(3) Entry
Any officer, employee, or representative [of and designated by the President] is authorized to enter at reasonable times any of the following:
(A) Any vessel, facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from.
(B) ... from which or to which a hazardous substance or pollutant or contaminant has been or may have been released.
(C) ... where such release is or may be threatened.

(D) ... where entry is needed to determine the need for response or the appropriate response or to effectuate a response action under this subchapter.
(4) Inspection and Samples
(A) Authority
Any officer, employee or representative described in paragraph (1) is authorized to inspect and obtain samples from any vessel, facility, establishment, or other place or property referred to in paragraph (3) or from any location of any suspected hazardous substance or pollutant or contaminant....
42 U.S.C. § 9604(e)(2), (3) & (4)(A).

is not used in the prosecution of any action against Respondent or otherwise."

CERCLA is silent on the subject of conditions. CERCLA's implementing regulations treat the imposition of conditions as a denial of consent, authorizing the issuance of an administrative or court order.[5] The OSWER directive similarly treats the imposition of conditions as a denial of consent. The directive does not suggest that conditions should be treated as noncompliance with the access and entry provisions, which would be subject to civil penalties:

> Persons on whose property EPA wishes to enter often attempt to place conditions upon entry. EPA personnel should not agree to conditions which restrict or impede the manner or extent of an inspection or response action, impose indemnity or compensatory obligations on EPA, or operate as a release of liability. The imposition of conditions of this nature on entry should be treated as denial of consent and a warrant or order should be obtained.

OSWER Directive No. 9829.2, Entry and Continued Access Under CERCLA (1987).

Omega's conditions were a direct response to the wording of the "voluntary" consent forms, which Omega allegedly believed could serve to waive Fourth Amendment and other rights during a future criminal prosecution. Omega's conditions were also a response to EPA's invitation to submit, in writing, any information, arguments, or comments Omega might have concerning Administrative Order 95–15.

What is essential here is that Omega did not place conditions upon entry, as discussed in the OSWER directive, but instead placed conditions upon the future use of the information obtained during the cleanup process. Specifically, Omega placed conditions on future use during a possible criminal prosecution for importation of CFCs. Whether EPA may use information obtained during a clean-

up as part of a future criminal prosecution does not implicate CERCLA's access and entry provisions and therefore is irrelevant to resolution of the present case.

Most significantly, at no point did Omega attempt to "close the gate" and bar site access to EPA or others associated with the CERCLA response action. Had Omega locked its gates until the company's conditions were met, we would be presented with an entirely different case. Here, Omega repeatedly assured EPA that it was willing to cooperate with the agency and the Administrative Order. In its June 13, 1995 letter explaining its objections to the Order, Omega noted that "[w]e are acting consistent with the Order and plan to do so in the future." In a subsequent letter objecting to EPA's demands to sign a "voluntary" consent form, Omega assured EPA that "[w]e will provide access as directed by Order 95–15."

### V.

#### Conclusion

Omega's refusal to provide unconditional written consent to provide access to its premises does not constitute a failure to comply with 42 U.S.C. § 9604(e). EPA has provided no evidence indicating that Omega denied or impeded access to the Site during the penalty period. We need not reach the issue of whether the alleged noncompliance was reasonable. The judgment is therefore reversed and remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

5. EPA regulations governing the implementation of response actions under CERCLA are codified in 40 C.F.R. § 300.400(d)(4)(i):

> If consent (for entry, access, or inspection) is not granted ... or if consent is conditioned in any manner, EPA, or the appropriate federal

agency, may issue an order pursuant to section 104(e)(5) of CERCLA directing compliance with the request for access.... EPA or the appropriate federal agency may ask the Attorney General to commence a civil action to compel compliance with either a request for access or an order directing compliance.