UNITED STATES of America,
Plaintiff,

v.

W.R. GRACE & COMPANY and
Kootenai Development Cor-
poration, Defendants.

No. CV 00–167–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

March 9, 2001.

Sherry S. Matteucci, Victoria L. Francis, Office of the U.S. Attorney, Billings, MT, Walker Smith, James D Freeman, U.S. Department of Justice—Environmental Enforcement, Denver, CO, for USA, plaintiff.

Gary L. Graham, Kelly M. Wills, Dean A. Hoistad, Terry J. MacDonald, Garlington, Lohn & Robinson, PLLP, Missoula, MT, John D. McCarthy, Holme Roberts & Owen, Denver, CO, for W.R. Grace & Company, Kootenai Development Corporation, defendants.

## ORDER

MOLLOY, Chief Judge.

### I. Procedural Background

On September 14, 2000, the United States Department of Justice, acting on behalf of the Environmental Protection Agency ("EPA"), filed a complaint and moved for an Order permitting it immediate access to properties in Libby, Montana. The properties are owned and/or

controlled by W.R. Grace & Company and Kootenai Development Corporation.[1] The Court scheduled a hearing for September 21, 2000, in order to give Defendants an opportunity to respond. On September 20, 2000, that hearing was vacated, because the HPA had not yet served the complaint. On October 2, 2000, Defendants responded to the EPA's motion. On the same date, Defendants filed a motion for court-ordered mediation. The EPA responded on October 16, 2000.

After a hearing on December 20, 2000,[2] I granted Defendants' motion for court-ordered mediation. The mediation was unsuccessful.

## II. Factual Background

The EPA seeks access to "two properties," or three sites owned and/or controlled by Defendants, in advancement of its investigation and formulation of response actions to redress asbestos contamination that it believes has occurred at the vermiculite Mine and Screening Plant in Libby. Before Grace ceased operations in 1990, Libby supplied about 80% of the world's supply of vermiculite. *See* EPA Ex. 1, Attachment 1 ("Action Memorandum") at 3. Ore was strip mined, drymilled at the mine to remove extraneous materials, and then trucked down Rainy Creek Road to the Screening Plant.

There it was separated into five size ranges for use in various products, such as insulation, construction materials, soil conditioner, and fertilizer and other agricultural chemicals. *See* Action Memorandum at 2. Throughout this process, asbestos fibers were distributed through the air, primarily in the form of dust. Chronic exposure to such fibers can result in asbestosis, mesothelioma, or lung cancer. Despite under-reporting, EPA tests have detected significant amounts of amphibole asbestos both in ambient air samples and in soil samples taken in and around Libby.[3]

The present motion concerns three sites that once were crucial to Grace's operations in Libby.[4] The properties now belong to the Kootenai Development Corporation. The first, the "Mine Site," comprises about 3600 acres seven miles northeast of Libby. A mining permit issued by the Montana Department of Environmental Quality applied to roughly 1200 acres of the Mine Site. Reclamation activities have yet to be completed with respect to approximately 120 of these acres.[5] The second, the "Kootenai Flyway," is located between Highway 37 and the Kootenai River. The Flyway is adjacent to and upstream from the Screening Plant.[6] *See* Pl. Fig. 4 (running from center to lower center-right). A conveyor

1. Kootenai Development Corporation purchased the properties from Grace. Last July, Grace purchased a controlling stock interest in Kootenai Development Corporation. Grace can therefore control access to the property.

2. A hearing scheduled for December 1, 2000, had to be vacated due to an unforeseeable conflict.

3. Laboratories conducting tests for the EPA have reported that the levels of asbestos contamination are probably underestimated, because the long, thin configuration of amphibole asbestos fibers makes detection by polarized light microscopy difficult. More accurate counts will probably have to await scanning electron microscope analysis.

4. The EPA issued a Unilateral Administrative Order to Grace last year concerning the "Export Plant." *See* Pl. Fig. 2 (in downtown Libby). That Order is not at issue here.

5. The parties do not state whether the Montana Department of Environmental Quality, the EPA, or a private entity has been overseeing these reclamation activities.

6. The Action Memorandum usually refers to the "Screening Plant," but sometimes it calls the same location the "Loading Facility." Compare, e.g., Pl. Fig. 2 *with* Fig. 4.

belt connected the Screening Plant to a third site, "the Bluffs," which lie across the River from the Screening Plant. The Bluffs comprise 42 acres and contain a quarter-acre railroad loading area and two stockpiling areas, each covering one-half to one acre. The Kootenai Development Corporation acquired each of these properties—at least the portions at issue here—from Grace.

The United States refers to the Flyway and the Bluffs together as "the Screening Plant parcels." They request access to "two properties," i.e., the Mine Site and "the Screening Plant parcels." The Screening Plant itself is currently owned by Mel and Lerah Parker, who operate a plant nursery and reside on the site.[7] To preserve the Defendants' greater precision, this Order will refer to the properties in question as the Mine Site, the Flyway, and the Bluffs.

The EPA began to negotiate with the Kootenai Development Corporation in November, 1999, to obtain access to its properties for investigation and cleanup. Mark Owens, then president and majority shareholder of the Corporation, granted access to the Mine Site for soil sampling and analysis and other investigatory activities on several occasions. It is not clear whether he granted access to the Flyway and the Bluffs. *Compare* Def.Ex. J, at 2, ¶ 3 ("I understood the access to the Mine Site was for—sampling and analytic activities."), *with id.* ¶¶ 3, 4 (discussing access to "KDC properties"). The Montana Department of Environmental Quality and representatives of Grace frequently accompanied the EPA in its visits to the Corporation's properties.

Although Owens did not agree to allow the Corporation's property to be used for waste disposal or other response activities, he discussed possible disposal locations with the EPA. The EPA informed Owens that it would eventually investigate the Mine Site and that recovery costs "could run into the millions." Def.Ex. J, ¶ 7. The EPA also told Owens that it expected to look elsewhere, presumably to Grace, to recover those costs. An EPA attorney, Matt Cohen, discussed with Owens an arrangement whereby the EPA would release the Corporation from liability and give it a covenant not to sue in exchange for use of the Mine as a disposal site and a 25% share in any amounts realized on the Corporation's sale of its properties. Defendants think this offer was "an odd twist." Def.Br. at 4.

On July 14, 2000, Grace became the majority shareholder of the Kootenai Development Corporation. On July 18, Grace notified the EPA that any previous, unwritten access authorizations given to the agency by Kootenai Development would not be honored. On September 1, after several attempts by the parties to reach an agreement, Kootenai Development gave the EPA a "Consent for Access to Property," limiting the EPA's access to investigatory activities at the Mine Site. In that Consent, Kootenai apparently did not give the EPA access to the Flyway or the Bluffs. Kootenai refused to authorize the EPA to take any response actions or to dispose of any hazardous materials at the Mine Site.

The EPA has presumably continued to conduct investigatory activities at the sites in question, but it brought the present action in order to obtain access for response actions, possibly including disposal.

### III. Analysis

To prevail on its motion for immediate access, the United States must establish five facts or legal conclusions:

---

7. The Parkers purchased the Screening Plant from Grace.

(1) The entry the EPA seeks is authorized by 42 U.S.C. § 9604(e)(2), (3), or (4).

(2) The EPA's right of entry has been obstructed by the Defendants. *Id.* § 9604(e)(5)(A) and (B)(i).

(3) The EPA has a reasonable basis to believe that there may be a release or threat of a release of a hazardous substance, pollutant, or contaminant. *Id.* § 9604(e)(5)(B).

(4) The EPA has sought the Defendants' consent to its entry. *Id.* § 9604(e)(5); *United States v. Omega Chem. Corp.,* 156 F.3d 994, 999 (9th Cir.1998).

(5) The demand for entry is not arbitrary and capricious, an abuse of discretion, or otherwise illegal. *Id.* § 9604(e)(5)(B)(i).

*See* Pl.Br. at 11; *United States v. City of New Orleans,* 86 F.Supp.2d 580, 583 (E.D.La.1999).

Only the fourth factor is not contested by Defendants.[8] It will not be analyzed here. That leaves four points to consider.

I conclude that the EPA is entitled to enter the properties under 42 U.S.C. § 9604(e)(3)(D). Defendants must allow access to the Flyway, the Bluffs, and the Mine Site for all purposes, i.e., to determine the need for response, to determine the appropriate response, and to effectuate response actions.

**A. Is the entry the EPA seeks authorized by 42 U.S.C. § 9604(e)(2), (3), or (4)?**

■ The United States argues that 42 U.S.C. § 9604(e)(3)(D) authorizes the EPA to enter the properties in question and to carry out the response it deems appropriate. 42 U.S.C. § 9604(e)(3)(D) provides that "[a]ny officer, employee, or representative described in paragraph (1) is authorized to enter at reasonable times ... [a]ny vessel, facility, establishment, or other place or property where entry is needed to determine the need for response or the appropriate response *or to effectuate a response action* under this subchapter" (emphasis added).[9]

*1. 42 U.S.C. § 9604(j)*

Defendants argue that 42 U.S.C. § 9604(e)(3)(D) does not authorize the EPA to conduct activities that, once completed, would amount to a taking. Defendants point to 42 U.S.C. § 9604(j), which authorizes the President or his delegate to "acquire, by purchase, lease, condemnation, donation, or otherwise, any real property or any interest in real property that the President in his discretion determines is needed to conduct a remedial action under this chapter." They contend that this provision indicates Congress' intent that the EPA should pay for land it will use in remedial actions before the agency uses it.[10] Because subsections (e)(3)(A), (B), and (C) do not apply to response actions, Defendants argue in effect that subsection (j) specifically prohibits actions under subsection (e)(3)(D).[11]

---

**8.** Defendants "expressly reserve the right to argue that EPA has not met the third requirement." Def.Br. at 8, n. 4. They did not argue that the EPA has not met the third requirement at the hearing.

**9.** Defendants state that " § 104(e) does not allow EPA entry onto any property to effectuate a response action." Def.Br. at 20. The statement is inexplicable.

**10.** In footnote six, Defendants' mistaken reasoning shines through. They emphasize that § 9604(j) permits the EPA to acquire property by "donation," which connotes a voluntary act. The word immediately preceding "donation" is "condemnation," a word that does riot connote voluntary munificence.

**11.** 42 U.S.C. § 9604(e) reads, in pertinent part, as follows:
(2) Access to information

Section 9604(j) also states that "[t]here shall be no cause of action to compel the President to acquire any interest in real property under this chapter." Defendants' reading of the provision would do just that—compel the EPA to acquire an interest in the property in question. Moreover, invoking § 9604(j) as a precondition to actions under § 9604(e)(3)(D) would force the agency to pay its way before it even knew exactly what response action was most appropriate. There is no indication in the statute that subsection (j) must be satisfied before actions can be taken under subsection (e). Nor is there any indication that the EPA must check its actions before they effect a taking. Indeed, the purpose of the legislation enacting subsection (e) was to broaden the EPA's powers to act in the face of impending or actual environmental dangers. *See, e.g., United States v. Fisher,* 864 F.2d 434, 439 (7th Cir.1988) (Posner, J.) ("The amendments direct the EPA in no uncertain terms to take peremptory steps to protect the public health."). The better reading is that subsection (j) authorizes the EPA to acquire property, for instance, by compulsory acquisition or by donation, but does not require it to do so.

Any officer, employee, or representative described in paragraph (1) may require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information or documents relating to such matter:

(A) The identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a vessel or facility or transported to a vessel or facility.

(B) The nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a vessel or facility.

(C) Information relating to the ability of a person to pay for or to perform a cleanup.

In addition, upon reasonable notice, such person either (i) shall grant any such officer, employee, or representative access at all reasonable times to any vessel, facility, establishment, place, property, or location to inspect and copy all documents or records relating to such matters or (ii) shall copy and furnish to the officer, employee, or representative all such documents or records, at the option and expense of such person.

(3) Entry

Any officer, employee, or representative described in paragraph (1) is authorized to enter at reasonable times any of the following:

(A) Any vessel, facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from.

(B) Any vessel, facility, establishment, or other place or property from which or to which a hazardous substance or pollutant or contaminant has been or may have been released.

(C) Any vessel, facility, establishment, or other place or property where such release is or may be threatened.

(D) Any vessel, facility, establishment, or other place or property where entry is needed to determine the need for response or the appropriate response or to effectuate a response action under this subchapter.

(4) Inspection and samples

(A) Authority

Any officer, employee or representative described in paragraph (1) is authorized to inspect and obtain samples from any vessel, facility, establishment, or other place or property referred to in paragraph (3) or from any location of any suspected hazardous substance or pollutant or contaminant. Any such officer, employee, or representative is authorized to inspect and obtain samples of any containers or labeling for suspected hazardous substances or pollutants or contaminants. Each such inspection shall be completed with reasonable promptness.

(B) Samples

If the officer, employee, or representative obtains any samples, before leaving the premises he shall give to the owner, operator, tenant, or other person in charge of the place from which the samples were obtained a receipt describing the sample obtained and, if requested, a portion of each such sample. A copy of the results of any analysis made of such samples shall be furnished promptly to the owner, operator, tenant, or other person in charge, if such person can be located.

### 2. "Need" for Response Activity

Defendants next contend that the EPA has not demonstrated that it "needs" to enter the properties in question to determine the need for response, to determine the appropriate response, or to take remedial actions. Because the EPA has an alternative—a landfill in Spokane, and perhaps an asbestos cell in the Lincoln County landfill as well—Defendants argue that it does not "need" access to the Mine Site in order to effectuate a response action.[12]

Permitting Defendants to quibble about whether the agency "needs" access would set an unsound precedent. The EPA is entrusted by Congress and the President with responsibility for taking actions that usually feature a considerable degree of discretion. The EPA's discretion should remain as unfettered as possible. To the extent Defendants argue that the EPA should not be able to dispose of toxic waste on Defendants' property without their consent, the argument is frustrated by the facts of the case, as discussed in part D, below. There is no need to credit the "needs" analysis.

### 3. "Reasonable Times"

Based on the statute's limitation of the EPA's actions to "reasonable times," Defendants also argue that the EPA's entry cannot be temporally open-ended or permanent. The EPA's current thinking is that hazardous materials removed from the Bluffs, the Flyway, and other sites in Libby should be disposed of at the Mine Site. Defendants argue that depositing hazardous materials at the Mine Site would constitute a permanent physical occupation of their property. That is not only a taking, according to Defendants, but is also a violation of the "reasonable times" limitation, which should restrict EPA actions to "normal working hours."

Operations at the sites in question ceased long ago. The Mine Site is in a remote location. Round-the-clock activity there would not disturb anyone. Activity at the Bluffs and the Flyway might need to be restricted, but the Court is confident that the EPA will consider such factors. Defendants' interpretation of the "reasonable time" restriction is too broad.

### B. Have the Defendants obstructed the EPA's right of entry?

Defendants agreed to let the EPA enter the Mine Site to take soil samples and other investigative measures. However, the EPA's right of entry has been limited to investigatory activities at the Mine Site, and it is not clear whether the EPA has had access to the Bluffs or the Flyway.

Defendants' request for sympathy with their legal predicament is a red herring. On one hand, Defendants assert that "[i]t is not clear ... whether [Kootenai Development Corporation] would have a Tucker Act claim if it voluntarily granted EPA access." Def.Br. at 9, n. 5. On the other hand, they contest the EPA's assertion that they have obstructed its right of access. *Id.* at 8. Thus, Defendants construe CERCLA to require them to refuse access in order to preserve a takings claim and yet to absolve them of the potential consequences—$27,500 a day—of "obstructing" access, because they have to obstruct access to preserve their rights.

█ If that construction were correct, the penalty provision would be meaning-

---

**12.** After the hearing, on February 9, 2001, the EPA filed a notice that it has begun to design an asbestos cell to be constructed at the existing Lincoln County landfill. This development does not change the result of the analysis. On February 16, 2001, Defendants responded to the Notice by stating that the design and prospective construction of the asbestos cell is another EPA action that is "unnecessary." *See* Defendant's Response to Notice filed February 16, 2001 (dkt # 34).

less. CERCLA places the burden on the EPA to show its authority for proposed actions. However, CERCLA also compels those who disagree with the EPA's authority to carefully analyze the agency's position. If the agency does not meet the statutory requirements, it may safely be opposed. If it follows the statute, Defendants face the consequences of an errant analysis. If the agency's proposed action effects a permanent physical occupation that deprives the landowner of other uses for the property, just compensation will be due,[13] but that does not mean that the EPA loses its statutory right of entry.

42 U.S.C. § 9604(e)(3)(D) authorizes the EPA to enter "to determine the need for response or the appropriate response or to effectuate a response action." Defendants have obstructed the EPA's right of entry to the extent the EPA has been denied access to the Mine Site, the Bluffs, or the Flyway for purposes of effectuating a response action.

C. *Does the EPA have a reasonable basis to believe that there may be a release or threat of a release of a hazardous substance, pollutant, or contaminant at former Grace sites in Libby?*

"Reasonable basis" is an "undemanding standard." *Fisher*, 864 F.2d at 438. The Action Memorandum demonstrates a "reasonable basis" to believe that asbestos contamination is a problem in Libby. The conclusion is as plain to see as the East Front of the Rocky Mountains.

D. *Is the demand for entry arbitrary and capricious, an abuse of discretion, or otherwise illegal?*

No statute can authorize the EPA to effect a taking without just compensation.

*See* U.S. Const. amend. V. Consequently, even though 42 U.S.C. § 9604(e)(3)(D) authorizes the EPA to enter where needed to effectuate a response action, the EPA cannot rely on the statute to permit it to deposit a large amount of contaminated waste on private property without just compensation. But the EPA does not argue that it need not pay; it argues that it need not pay in advance.

Defendants are correct that this case is different from the cases adduced by the United States in support of its access. In *United States v. Mountaineer Refining Co.*, 886 F.Supp. 824 (D.Wyo.1995), the EPA requested access to a site for the purposes of "concluding the removal action under the [Administrative Order], including tank decommissioning (cleaning), tank removal (either onsite or offsite, depending upon the condition of the tank), excavation of visually [sic] contaminated soil, treatment of excavated soil, verification sampling of soil, and investigation and delineation of the contaminated groundwater plume." *Id.* at 825. Although the refinery feared that the EPA might "destroy its plant and tanks," *id.* at 826, its fears were speculative.

Similarly, in *Fisher*, there was "no indication that the EPA is engaging in or has plans to engage in activities on the farm that would be so disruptive as to constitute a taking of the property." 864 F.2d at 438–39. And in *United States v. Charles George Trucking Co.*, 682 F.Supp. 1260 (D.Mass.1988), the court reasoned that "it is apparent that the government's entry upon the defendant's property would be lawful. Accordingly, any subsequent 'taking' that results from the lawful entry would also be lawful." *Id.* at 1270 n. 15. The EPA's entry in that case was confined to on-site containment. *See id.* at 1262–63.

**13.** Defendants agree that this legal proposition is "undoubtedly" correct. Def.Br. at 9, n. 5.

In none of these cases did the EPA propose, as one option among others, to deposit toxic waste trucked in from various sites on private property.[14] Starting from this observation, Defendants assert that "EPA attempts to twist the statute to grant itself the authority to dispose of waste generated from a particular response action at almost any other location regardless of its relationship, if any, to the facility subject to the release." Def.Br. at 14. Defendants foresee dire consequences for the playgrounds of tender young schoolchildren, defenseless against the vicissitudes of EPA discretion. *See* Def.Br. at 15. Grace should have acknowledged this concern for the public long ago in the sordid history of asbestos and its harmful effects.

◼ Defendants may have a point, but the facts defeat it. The statute grants the EPA considerable power and discretion. Such discretion might be abused. However, in this case, the relationship between the "waste generated from a particular response action" and the proposed disposal site could not be more obvious. The EPA seeks access to the Mine Site, the source of the hazardous material that the EPA seeks to dispose of. If, in another case, the EPA sought access to an "innocent" tract of land in order to dump hazardous waste on it, its demand for entry might be considered arbitrary and capricious. If other alternatives for disposal were plainly superior to the EPA's proposed actions, then its demand for entry might be an abuse of discretion. This is not such a case. Grace's own selection of the Mine Site as a repository for contaminated soil from its own properties proves that the EPA's selection of the Mine Site is not arbitrary and capricious or an abuse of discretion.

Defendants also argue that other contaminants might be partially responsible for the toxicity of the soil at the Screening Plant. Mel and Lerah Parker have operated a plant nursery and mushroom farm at the Screening Plant site for the past six years or so. Defendants contend that the nursery might have dumped pesticides, herbicides, construction debris, or petroleum hydrocarbons into the soil. They also argue that vermiculite is naturally occurring in the area and has been found beneath a 7,000–year old archaeological site. *See* Def.Ex. K at 2, ¶ 6. None of the other possible sources for contamination at the Screening Plant defeat the reasonable inference that most of the contamination came from Grace's vermiculite mining and processing operations in Libby.

It is possible that the EPA's proposal to deposit contaminated soil in the Mine will deprive Defendants of "all economically feasible use."[15] *Lucas v. South Carolina*

---

14. At the hearing, the EPA stated:
   We're stockpiling it [soil contaminated with amphibole asbestos fibers] pending a decision of this Court on access. When we—assuming we are able to get access to the property up at the Mine Site, we're going to dispose of the soil that's been removed from the Parkers' property as well as soil the EPA removes from the Kootenai Flyway property here and the Bluffs property up here.
   Tr. at 7.

15. Fifth Amendment ironies abound in this case. First, Kootenai Development is not opposed to using the Mine Site for the purpose envisioned by the EPA. It is doing so right now, and it is doing it on behalf of Grace, from whom it purchased its property, from whom most of the contaminants came, and from whom its now takes its directions. A letter from Kootenai Development's attorneys to the EPA states:
   We strongly disagree that your use of the mine property is "necessary" to complete the removal action at the Screening Plant. As you know, there are licensed disposal facilities all over the country, including a disposal facility as close as Spokane, Washington, that could accept the EPA-generated materials from the Screening Plant. *You*

*Coastal Council,* 505 U.S. 1003, 1016 n. 7, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). *See also id.* at 1015–16 (discussing permanent regulatory intrusions on the use of land or buildings and the "deprivation of all economically feasible use" as exceptions to the general rule that takings questions must be analyzed in intensively factual, ad hoc manner). However, it is also possible that Defendants will continue to use the Mine Site as a waste repository after the EPA has completed its response actions. It is possible that the EPA will not use the Mine Site for disposal at all but will instead use an asbestos cell to be constructed at the Lincoln County landfill. *See* Notice filed February 9, 2001 (dkt # 33).

The other arguments advanced by Defendants—the vagueness of the property descriptions in the EPA's proposed access agreements (Def.Br. at 11–13) and the purported requirement that the EPA's response actions be tied to the location giving rise to the response (*id.* at 14–16)—have little force. The Court does not find credible the Defendants' assertion that they are confused about which locations the EPA is talking about. Nor is the EPA required to give legal descriptions prior to undertaking a response action. Finally, the Mine Site is logically tied to the Flyway and the Bluffs. The language of the statute does not prohibit the EPA from removing waste from one physical location and depositing it in another, nonadjacent location when both locations host contaminated soils.[16]

## IV. Conclusion

The EPA has a statutory right of access to each of Kootenai Development's properties in order to "determine the need for response or the appropriate response or to effectuate a response action." The EPA may have access to the Flyway, the Bluffs, and the Mine for any of the statutory purposes.

Accordingly, IT IS HEREBY ORDERED that the United States' motion for immediate access (dkt # 2) is GRANTED.

*certainly are aware that in the absence of an appropriate in situ option, Grace contemplated using the Spokane disposal facility until recently when Grace negotiated a fair and lawful agreement with KDC to obtain access and disposal rights on KDC's property.*

Def.Ex. B, at 1 (emphasis added).

The second irony is that the Mine Site's use as a disposal facility for Grace is precisely what indicates that the EPA's action might amount to a taking.

I want to make it absolutely clear that KDC is not opposed to granting EPA access to its property upon reasonable terms for activities related to EPA's removal action at the Screening Plant site in Libby.... [S]uch terms should include a precise description of the particular portions of KDC's property EPA wishes to enter; a description of the specific activities EPA proposes to conduct upon such property, and just compensation.... To the extent that EPA intends to

dispose of remediation wastes and hazardous substances on KDC's property, such reasonable terms should also include appropriate assurances from the government (e.g., indemnification, release, contribution protection) against any future liability arising out of EPA's activities on the property. Def.Ex. H, at 1.

The brash bargaining in this letter does not undermine the fundamental principle that the EPA cannot appropriate private property to public uses without paying the piper. Granting the EPA's motion for an order directing access also does not undermine that principle.

16. Defendants' reliance on 42 U.S.C. § 9604(e)(1) (authorizing action on properties where release of hazardous substance is threatened or on properties adjacent to them) is inapposite. The Bluffs, the Flyway, and the Mine Site are all properties where releases are threatened.